# KUSPER ET AL. *v.* PONTIKES

No. 71–1631. Argued October 9, 1973—Decided November 19, 1973

STEWART, J., delivered the opinion of the Court, in which DOUGLAS, BRENNAN, WHITE, MARSHALL, and POWELL, JJ., joined. BURGER, C. J., concurred in the result. BLACKMUN, J., filed a dissenting opinion, *post,* p. 61. REHNQUIST, J., filed a dissenting opinion, in which BLACKMUN, J., joined, *post,* p. 65.

*Aldus S. Mitchell* argued the cause for appellants. With him on the briefs were *William R. Ming, Jr.,* and *Sophia H. Hall.*

*Ray Jeffrey Cohen* argued the cause and filed a brief for appellee.

MR. JUSTICE STEWART delivered the opinion of the Court.

Under § 7–43 (d) of the Illinois Election Code, a person is prohibited from voting in the primary election of a political party if he has voted in the primary of any other party within the preceding 23 months.[1] Appellee, Harriet G. Pontikes, is a qualified Chicago voter who voted in a Republican primary in February 1971;[2] she wanted to vote in a March 1972 Democratic primary, but was barred from doing so by this 23-month

---

[1] Ill. Rev. Stat., c. 46, § 7–43 provides, in pertinent part:
"No person shall be entitled to vote at a primary:

. . . . .

"(d) If he has voted at a primary held under this Article 7 of another political party within a period of 23 calendar months next preceding the calendar month in which such primary is held: Provided, participation by a primary elector in a primary of a political party which, under the provisions of Section 7–2 of this Article, is a political party within a city, village or incorporated town or town only and entitled hereunder to make nominations of candidates for city, village or incorporated town or town offices only, and for no other office or offices, shall not disqualify such primary elector from participating in other primaries of his party: And, provided, that no qualified voter shall be precluded from participating in the primary of any purely city, village or incorporated town or town political party under the provisions of Section 7–2 of this Article by reason of such voter having voted at the primary of another political party within a period of 23 calendar months next preceding the calendar month in which he seeks to participate is held."

[2] The Republican primary in which the appellee voted involved nominations for the offices of mayor, city clerk, and city treasurer of Chicago.

rule.[3] She filed a complaint for declaratory and injunctive relief in the United States District Court for the Northern District of Illinois, alleging that § 7–43 (d) unconstitutionally abridged her freedom to associate with the political party of her choice by depriving her of the opportunity to vote in the Democratic primary. A statutory three-judge court was convened,[4] and held, one judge dissenting, that the 23-month rule is unconstitutional. 345 F. Supp. 1104.[5] We noted probable jurisdiction of this appeal from that judgment. 411 U. S. 915.[6]

## I

At the outset, we are met by the appellants'[7] argument that the District Court should have abstained from adjudicating the constitutionality of the 23-month rule. They base this argument upon that portion of § 7–43 (d) which provides that:

"[P]articipation by a primary elector in a primary of a political party which, under the provisions of Section 7–2 of this Article, is a political party within

---

[3] The March 1972 Democratic primary involved, *inter alia,* nominations for Governor, United States Senator, United States Representative, state legislators, county officers, and delegates to the National Convention of the Democratic Party.

[4] 28 U. S. C. §§ 2281, 2284.

[5] The District Court upheld the constitutional validity of Ill. Rev. Stat., c. 46, §§ 7–43 (a) and 7–44, which require a declaration of party affiliation as a prerequisite to voting in a primary election. This holding, which was unanimous, has not been appealed.

[6] This case was consolidated in the District Court with a similar action brought by two other voters against the county clerk of Lake County, Illinois. The defendant in that case has not appealed from the District Court's judgment.

[7] The appellants in this case are members of the Chicago Board of Election Commissioners, who are responsible for administering the provisions of the Illinois Election Code within the city. See Ill. Rev. Stat., c. 46, § 6–21 *et seq.*

a city, village or incorporated town or town only and entitled hereunder to make nominations of candidates for city, village or incorporated town or town offices only, and for no other office or offices, shall not disqualify such primary elector from participating in other primaries of his party . . . ." Ill. Rev. Stat., c. 46, § 7–43 (d).

The appellants note that the February 1971 Republican primary election in which Mrs. Pontikes voted involved only nominations for the offices of mayor, city clerk, and city treasurer of the city of Chicago. They claim that the state courts might interpret this 1971 primary to have been one of a "political party within a city . . . only," and thus outside the purview of the 23-month rule.

As we stated in *Lake Carriers' Assn.* v. *MacMullan,* 406 U. S. 498, 509:

"Abstention is a 'judge-made doctrine . . . , first fashioned in 1941 in *Railroad Commission* v. *Pullman Co.,* 312 U. S. 496, [that] sanctions . . . escape [from immediate decision] only in narrowly limited "special circumstances," *Propper* v. *Clark,* 337 U. S. 472, 492,' *Zwickler* v. *Koota,* 389 U. S. 241, 248 (1967), justifying 'the delay and expense to which application of the abstention doctrine inevitably gives rise.' *England* v. *Medical Examiners,* 375 U. S. 411, 418 (1964)." [8]

The paradigm of the "special circumstances" that make abstention appropriate is a case where the challenged state statute is susceptible of a construction by the state judiciary that would avoid or modify the necessity of reaching a federal constitutional question. *Zwickler* v. *Koota,* 389 U. S. 241, 249; *Harrison* v. *NAACP,* 360 U. S. 167, 176–177. Abstention in such

---

[8] Bracketed material in original.

circumstances not only serves to minimize federal-state friction, but also avoids premature and perhaps unnecessary constitutional adjudication. *Harman* v. *Forssenius,* 380 U. S. 528, 534. But the doctrine of abstention "contemplates that deference to state court adjudication only be made where the issue of state law is uncertain." *Ibid.* Where, on the other hand, it cannot be fairly concluded that the underlying state statute is susceptible of an interpretation that might avoid the necessity for constitutional adjudication, abstention would amount to shirking the solemn responsibility of the federal courts to "guard, enforce, and protect every right granted or secured by the Constitution of the United States," *Robb* v. *Connolly,* 111 U. S. 624, 637.

We think that the Illinois statute involved in this case is not fairly susceptible of a reading that would avoid the necessity of constitutional adjudication. The appellants' argument—that the February 1971 Chicago Republican primary might be considered that of a "political party within a city . . . only"—is foreclosed by the decision of the Illinois Supreme Court in *Faherty* v. *Board of Election Comm'rs,* 5 Ill. 2d 519, 126 N. E. 2d 235. That decision made it clear that the kind of "local" primaries that are outside the scope of § 7–43 (d) are simply those of " 'purely city . . . political part[ies]' "— those parties entitled, under § 7–2 of the Illinois Election Code, to make nominations for city offices *only.* *Id.,* at 524, 126 N. E. 2d, at 238.[9]

---

[9] Ill. Rev. Stat., c. 46, § 7–2 defines the term "political party" under Illinois law, and states the offices for which various types of political parties are entitled to make nominations. Under § 7–2, a party that garners more than 5% of the entire vote cast at a statewide general election is defined as a "political party within the State," and is entitled to make nominations for all state and county offices in the next succeeding primary. Similarly, a party that polls more than 5% of the entire vote cast at a munic-

Since both the Democratic and Republican parties are, of course, entitled in Illinois to make nominations not only for city offices, but for congressional, state, and county offices as well, the *Faherty* court held that they were not within the statutory definition of "city" parties. It follows then, that despite the fact that the February 1971 Republican primary in which the appellee voted involved only nominations for offices within the city of Chicago, Mrs. Pontikes was still clearly barred by the 23-month rule from voting in the March 1972 Democratic primary.[10] The District Court was thus wholly justified in declining to abstain from deciding the constitutional validity of the 23-month rule, and it is to that issue that we now turn.

## II

There can no longer be any doubt that freedom to associate with others for the common advancement of political beliefs and ideas is a form of "orderly group

---

ipal general election is defined as a "political party within . . . [a] city," and is entitled to make nominations for city elective positions at the next succeeding primary.

Under § 7–43 (d), a "political party within a city . . . only" is one that has qualified under § 7–2 to make only city nominations; in other words, a party that has polled more than 5% of the vote at the preceding municipal general election, but less than 5% of the vote at the preceding statewide general election. Obviously, the Republican party, in whose 1971 Chicago primary the appellee voted, does not fit within this description.

[10] It is true, as the appellants argue, that the plaintiff in *Faherty* v. *Board of Election Comm'rs*, 5 Ill. 2d 519, 126 N. E. 2d 235, wished to vote in a Chicago Democratic primary after having voted, within the past year, in a statewide Republican primary; thus, the factual setting in *Faherty* was precisely the converse of that here. This, however, is a distinction without a difference. The holding of *Faherty* was that Republican and Democratic primaries, even those involving only citywide offices, were not primaries of political parties "within a city . . . only." See n. 9, *supra*. Thus, these primaries are fully within the purview of the § 7–43 (d) 23-month rule.

activity" protected by the First and Fourteenth Amendments. *NAACP* v. *Button,* 371 U. S. 415, 430; *Bates* v. *Little Rock,* 361 U. S. 516, 522–523; *NAACP* v. *Alabama,* 357 U. S. 449, 460–461. The right to associate with the political party of one's choice is an integral part of this basic constitutional freedom. *Williams* v. *Rhodes,* 393 U. S. 23, 30. Cf. *United States* v. *Robel,* 389 U. S. 258.

To be sure, administration of the electoral process is a matter that the Constitution largely entrusts to the States.[11] But, in exercising their powers of supervision over elections and in setting qualifications for voters, the States may not infringe upon basic constitutional protections. See, *e. g., Dunn* v. *Blumstein,* 405 U. S. 330; *Kramer* v. *Union School District,* 395 U. S. 621; *Carrington* v. *Rash,* 380 U. S. 89. As the Court made clear in *Williams* v. *Rhodes, supra,* unduly restrictive state election laws may so impinge upon freedom of association as to run afoul of the First and Fourteenth Amendments. 393 U. S., at 30. And see *id.,* at 35–41 (DOUGLAS, J., concurring); *id.,* at 41–48 (Harlan, J., concurring).

There can be little doubt that § 7–43 (d) substantially restricts an Illinois voter's freedom to change his political party affiliation. One who wishes to change his party registration must wait almost two years before his choice will be given effect. Moreover, he is forced to forgo participation in any primary elections occurring within the statutory 23-month hiatus. The effect of the Illinois statute is thus to "lock" the voter into his pre-existing party affiliation for a substantial period of time following participation in any primary election, and each succeeding primary vote extends this period of confinement.

---

[11] See Art. I, § 2; Art. II, § 1. With respect to elections to federal office, however, the Court has held that Congress has power to establish voter qualifications. *Oregon* v. *Mitchell,* 400 U. S. 112.

The 23-month rule does not, of course, deprive those in the appellee's position of all opportunities to associate with the political party of their choice. But neither did the state attempts to compel disclosure of NAACP membership lists in *Bates* v. *Little Rock* and *NAACP* v. *Alabama* work a total restriction upon the freedom of the organization's members to associate with each other. Rather, the Court found in those cases that the statutes under attack constituted a "substantial restraint" [12] and a "significant interference" [13] with the exercise of the constitutionally protected right of free association.

The same is true of § 7–43 (d). While the Illinois statute did not absolutely preclude Mrs. Pontikes from associating with the Democratic party, it did absolutely preclude her from voting in that party's 1972 primary election. Under our political system, a basic function of a political party is to select the candidates for public office to be offered to the voters at general elections. A prime objective of most voters in associating themselves with a particular party must surely be to gain a voice in that selection process. By preventing the appellee· from participating at all in Democratic primary elections during the statutory period, the Illinois statute deprived her of any voice in choosing the party's candidates, and thus substantially abridged her ability to associate effectively with the party of her choice.

### III

As our past decisions have made clear, a significant encroachment upon associational freedom cannot be justified upon a mere showing of a legitimate state interest. *Bates* v. *Little Rock, supra,* at 524; *NAACP* v. *Alabama, supra,* at 463. For even when

---

[12] *NAACP* v. *Alabama,* 357 U. S. 449, 462.
[13] *Bates* v. *Little Rock,* 361 U. S. 516, 523.

pursuing a legitimate interest, a State may not choose means that unnecessarily restrict constitutionally protected liberty. *Dunn* v. *Blumstein,* 405 U. S., at 343. "Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms." *NAACP* v. *Button,* 371 U. S., at 438. If the State has open to it a less drastic way of satisfying its legitimate interests, it may not choose a legislative scheme that broadly stifles the exercise of fundamental personal liberties. *Shelton* v. *Tucker,* 364 U. S. 479, 488.

The appellants here urge that the 23-month rule serves the purpose of preventing "raiding"—the practice whereby voters in sympathy with one party vote in another's primary in order to distort that primary's results. It is said that our decision in *Rosario* v. *Rockefeller,* 410 U. S. 752, recognized the state interest in inhibiting "raiding," and upheld the constitutional validity of legislation restricting a voter's freedom to change parties, enacted as a means of serving that interest.

It is true, of course, that the Court found no constitutional infirmity in the New York delayed-enrollment statute [14] under review in *Rosario.* That law required a voter to enroll in the party of his choice at least 30 days before a general election in order to be eligible to vote in the next party primary, and thus prevented a change in party affiliation during the approximately 11 months between the deadline and the primary election.[15] It is also true that the Court recognized in *Rosario* that a State may have a legitimate interest in seeking to curtail "raiding," since that practice may

[14] N. Y. Election Law § 186.

[15] New York presidential primaries are held in June; thus, in presidential election years, the cutoff date prescribed by § 186 occurs about eight months before the primary. *Rosario* v. *Rockefeller,* 410 U. S. 752, 760.

affect the integrity of the electoral process. *Id.,* at 761. But it does not follow from *Rosario* that the Illinois statutory procedures also pass muster under the Fourteenth Amendment, for the Illinois Election Code differs from the New York delayed-enrollment law in a number of important respects.

The New York statute at issue in *Rosario* did not prevent voters from participating in the party primary of their choice; it merely imposed a time limit on enrollment. Under the New York law, a person who wanted to vote in a different party primary every year was not precluded from doing so; he had only to meet the requirement of declaring his party allegiance 30 days before the preceding general election. The New York law did not have the consequence of "locking" a voter into an unwanted party affiliation from one election to the next; any such confinement was merely the result of the elector's voluntary failure to take timely measures to enroll. *Id.,* at 757–759. The Court therefore concluded that the New York delayed-enrollment law did not prevent voters "from associating with the political party of their choice." *Id.,* at 762. And see *id.,* at 758 and n. 8.

The basic difference in the Illinois law is obvious. Since the appellee here voted in the 1971 Republican primary, the state law absolutely precluded her from participating in the 1972 Democratic primary. Unlike the petitioners in *Rosario,* whose disenfranchisement was caused by their own failure to take timely measures to enroll, there was no action that Mrs. Pontikes could have taken to make herself eligible to vote in the 1972 Democratic primary.[16] The Illinois law, unlike that of

---

[16] She could, of course, have made herself eligible to vote in the 1972 Democratic primary by forgoing participation in the 1971 Republican primary. But such a course would have prevented her from associating with the party of her choice in 1971, and thus

New York, thus "locks" voters into a pre-existing party affiliation from one primary to the next, and the only way to break the "lock" is to forgo voting in *any* primary for a period of almost two years.

In other words, while the Court held in *Rosario* that the New York delayed-enrollment scheme did not. prevent voters from exercising their constitutional freedom to associate with the political party of their choice, the Illinois 23-month rule clearly does just that. It follows that the legitimate interest of Illinois in preventing "raiding" cannot justify the device it has chosen to effect its goal. For that device conspicuously infringes upon basic constitutional liberty. Far from supporting the validity of the Illinois legislation, the Court's decision in *Rosario* suggests that the asserted state interest can be attained by "less drastic means," which do not unnecessarily burden the exercise of constitutionally protected activity.

We conclude, therefore, that § 7–43 (d) of the Illinois Election Code unconstitutionally infringes upon the right of free political association protected by the First and Fourteenth Amendments. The judgment of the District Court is accordingly

*Affirmed.*

THE CHIEF JUSTICE concurs in the result.

MR. JUSTICE BLACKMUN, dissenting.

The deprivation Mrs. Pontikes claims to have suffered, and which the Court today enshrouds with the mantle of unconstitutionality, is that she has been restrained by the Illinois statute from voting in *one* primary election of *one* party in the relatively minor context of a personal desire to undo an established party affiliation. Apart from this meager restraint, appellee Pontikes is

in no way would have obviated the constitutional deficiencies inherent in the Illinois law.

fully free to associate with the party of her varying choice. She is, and has been, completely free to vote as she chooses in any general election. And she was free to vote in the primary of the party with which she had affiliated and voted in the preceding primary.

It is important, I think—and deserving of repeated emphasis—to note that this very limited statutory restriction on the appellee's exercise of her franchise is triggered solely by her personal and voluntary decision. This being so, the Court's conclusion seems to me to dilute an important First Amendment concept the vitality of which, in the long run, necessarily will suffer from strained and artificial applications of this kind. The mere fact that a state statute lightly brushes upon the right to vote and the right of association, important as these are, should not automatically result in invalidation. Prior case law does not require a conclusion of invalidity where, as here, the intrusion is so minor. See *McDonald* v. *Board of Election Comm'rs,* 394 U. S. 802 (1969); *Rosario* v. *Rockefeller,* 410 U. S. 752 (1973).

In nearly all the voting cases relied upon by the Court and by the appellee, the Court was faced with situations where the disqualification amounted to a direct disenfranchisement or a vote dilution suffered by a discrete class whose impediment, as so imposed, was the result of an involuntary condition not directly tied to the franchise. See, for example, *Harper* v. *Virginia Board of Elections,* 383 U. S. 663 (1966) (poll tax and wealth); *Reynolds* v. *Sims,* 377 U. S. 533 (1964) (location); *Cipriano* v. *City of Houma,* 395 U. S. 701 (1969) (property ownership); *Carrington* v. *Rash,* 380 U. S. 89 (1965) (military status). Cf. *Dunn* v. *Blumstein,* 405 U. S. 330 (1972) (residence). In each of these cases there was a direct impairment of the ability of the affected class, without voluntary action, to participate in the electoral process. The level of intrusion was markedly significant.

What is before us here is a fairly complex statutory structure designed by Illinois to protect the integrity of the ballot box and the party system. The interest asserted by the State is clearly a legitimate one. *Rosario* v. *Rockefeller,* 410 U. S., at 761; *Dunn* v. *Blumstein,* 405 U. S., at 345; *Bullock* v. *Carter,* 405 U. S. 134, 145 (1972). And, it seems to me, means of the kind Illinois has employed are reasonably related to the fulfillment of that interest. The extent to which organized party raiding can disrupt, with unfortunate results, the orderly process of party primary balloting is, perhaps, open to reasonable differences of opinion. Indeed, in this case the parties have joined issue as to the precise degree of impact this practice has had in recent Illinois elections. Regardless of which factual version is to be credited, the legitimacy of the interest is unquestioned. With respect to a State like Illinois, where party regimentation on an extensive scale is legendary, the Court, in my view, should move cautiously when it is tempted to pass judgment in terms of assuming that there is a better or a less drastic means by which the State is able to achieve its admittedly laudable and lawful purpose.

By resorting to a standard of rigid and strict review, and by indulging in what I fear is a departure from the appropriately deferential approach in *Rosario,* the Court places itself in the position of failing to give the States the elbow room they deserve and must possess if they are to formulate solutions for the many and particular problems confronting them that are associated with the preservation of the integrity of the franchise. Cf. *Phoenix* v. *Kolodziejski,* 399 U. S. 204 (1970); *Burns* v. *Fortson,* 410 U. S. 686, 687 (1973) (concurring opinion). Surely, at some point, the important interest of the State in protecting its entire electoral system outweighs a minor

and incidental burden that happens to fall on a few uniquely situated citizens.

The Illinois Legislature has determined that a rule precluding voting in the primaries of different parties in successive annual elections is a desirable and necessary means by which to preserve an otherwise vulnerable structure. In *Rosario,* 410 U. S., at 762, we applied a "particularized legitimate purpose" standard to a similarly directed scheme and upheld the New York statute. As MR. JUSTICE REHNQUIST points out in his dissent, *post,* at 68, the degree of disenfranchisement resulting from the New York provision is potentially as great as, if not greater than, the Illinois provision challenged here. That case and this one, taken together, therefore, effect incongruous results. Not only is the actual disenfranchisement in this case no greater than that in *Rosario,* but the Illinois provision has a more rational relation to its purpose than does the New York provision. The New York statute specified an arbitrary time period prior to which it is assumed that organized party switching for raiding purposes will not occur. In contrast, Illinois chose not to employ a flat time limit that is by nature speculative and arbitrary; instead, it tied its disqualification directly to a significant event, namely, a vote in another party's last primary. Seemingly, the 23-month period was chosen so that the limitation would not extend back beyond the most recent primary. When primaries are held annually, the 23-month period amounts to no more than a one-year limitation, and in this respect the statute is drawn as narrowly as can be expected for a system that is tied to a prior primary vote rather than a designated time period. By tying the cutoff to a primary, the Illinois scheme seems directly designed to succeed in preventing organized crossovers, for it is highly unlikely that any significant number of party regulars would ever be instructed not to vote at all in

one primary in order to subvert the next one that will not be held for another year.

Mr. Justice Rehnquist also observes that the Illinois system does have the side effect of creating a *per se* exclusion for a few voters. It is this factor, apparently, that has caused the Court to seek to distinguish *Rosario*. In New York the disqualification occasioned by the time limit will have its impact, more often than not, upon those who have not been diligent. This, indeed, was the very situation in *Rosario*. The Illinois provision, on the other hand, affects only party switchers. And they clearly are the group most amenable to organized raiding. I do not agree that any marginal difference that may exist between the New York rule and the Illinois rule must have the effect of transforming a "legitimate time limitation," *Rosario*, 410 U. S., at 762, into an unconstitutional denial of freedom of association. This incongruity underscores what I believe to be the potential mischief that results from an easy and all-too-ready resort to a strict-scrutiny standard in election cases of this kind. To be sure, the line between constitutionality and unconstitutionality must be drawn somewhere. But I would not draw it short of what Illinois has done here.

Mr. Justice Rehnquist, with whom Mr. Justice Blackmun joins, dissenting.

The Court decides that the Illinois rule disqualifying a person from voting in the primary of one political party if he has voted in the primary of another political party during the preceding 23 months imposes an impermissible burden on Illinois voters' exercise of their right of free political association. In so doing it distinguishes *Rosario* v. *Rockefeller*, 410 U. S. 752 (1973), decided last Term. I find *Rosario* more difficult to distinguish than does the Court.

Section 7–43 of the Illinois Election Code provides that every person eligible to register to vote is entitled to vote at primary elections; it goes on to set out a number of exceptions to that general entitlement, including both persons disqualified under the 23-month rule challenged in this case and persons disqualified because they refuse to declare a party affiliation.[1] Section 7–44 re-

---

[1] Ill. Rev. Stat., c. 46, § 7–43, provides:

"Every person having resided in this State 6 months and in the precinct 30 days next preceding any primary therein who shall be a citizen of the United States above the age of 21 years, shall be entitled to vote at such primary.

"The following regulations shall be applicable to primaries:

"No person shall be entitled to vote at a primary:

"(a) Unless he declares his party affiliations as required by this Article;

"(b) Who shall have signed the petition for nomination of a candidate of any party with which he does not affiliate, when such candidate is to be voted for at the primary;

"(c) Who shall have signed the nominating papers of an independent candidate for any office for which office candidates for nomination are to be voted for at such primary; or

"(d) If he has voted at a primary held under this Article 7 of another political party within a period of 23 calendar months next preceding the calendar month in which such primary is held: Provided, participation by a primary elector in a primary of a political party which, under the provisions of Section 7–2 of this Article, is a political party within a city, village or incorporated town or town only and entitled hereunder to make nominations of candidates for city, village or incorporated town or town offices only, and for no other office or offices, shall not disqualify such primary elector from participating in other primaries of his party: And, provided, that no qualified voter shall be precluded from participating in the primary of any purely city, village or incorporated town or town political party under the provisions of Section 7–2 of this Article by reason of such voter having voted at the primary of another political party within a period of 23 calendar months next preceding the calendar month [in which such primary] in which he seeks to participate is held.

"(e) In cities, villages and incorporated towns having a board

quires a primary voter to declare his party affiliation to the primary judges at the polling place; it further provides that, if challenged, the voter must establish his right to vote.[2] Section 7–45 requires a challenged voter to supply an affidavit, in a statutorily prescribed form, to establish that he is entitled to vote under § 7–43. The affidavit states, *inter alia*, that the affiant has not voted in the primary of any other political party within the forbidden 23-month period.

The Illinois system of primary elections, unlike the New York system before the Court in *Rosario*, does not require a voter to have enrolled as a member of a party months in advance in order to be eligible to vote in that party's primary. Illinois provides instead for a declara-

---

of election commissioners only voters registered as provided by Article 6 of this Act shall be entitled to vote at such primary.

"(f) No person shall be entitled to vote at a primary unless he is registered under the provisions of Article 4, 5 or 6 of this Act, when his registration is required by any of said Articles to entitle him to vote at the election with reference to which the primary is held."

[2] Ill. Rev. Stat., c. 46, § 7–44 provides: "Any person desiring to vote at a primary shall state his name, residence and party affiliation to the primary judges, one of whom shall thereupon announce the same in a distinct tone of voice, sufficiently loud to be heard by all persons in the polling place. When article 4, 5 or 6 is applicable the Certificate of Registered Voter therein prescribed shall be made and signed and the official poll record shall be made. If the person desiring to vote is not challenged, one of the primary judges shall give to him one, and only one, primary ballot of the political party with which he declares himself affiliated, on the back of which such primary judge shall endorse his initials in such manner that they may be seen when the primary ballot is properly folded. If the person desiring to vote is challenged he shall not receive a primary ballot from the primary judges until he shall have established his right to vote as hereinafter provided. No person who refuses to state his party affiliation shall be allowed to vote at a primary."

tion of party affiliation at the primary polling place. And Illinois, not surprisingly in view of its different primary system, has chosen another way to protect its interest in preventing "raiding" than has New York. It is true, as the Court makes clear, that the Illinois rule requires a voter affiliated with one party to sit out primaries during a period of 23 months in order to effectuate a switch in affiliation to another party and qualify to vote in its primaries. In this respect Illinois' rule imposes a greater burden on its voters' associational freedom than does New York's, since in New York a sufficiently prescient and diligent voter can vote in a different party's primary every year. Of course, it cannot be said whether the Illinois appellee here underwent her change in party loyalty in time, and would have taken the necessary steps to enroll, had Illinois had New York's rule.

On the other hand, Illinois' rule imposes a lesser burden on its previously unaffiliated voters than does New York's. Indeed, it imposes a lesser burden on any voter who has, for whatever reason, failed to vote in the primary of another party within the past 23 months. Such voters are not required to foresee their interest in the primary by eight or more months, as are New York voters under the rule upheld in *Rosario*. As a practical matter, a voter is not required to swear that he has not participated in the primary of another party as a condition of his right to vote unless he is challenged. In these respects the Illinois rule is more closely tailored to the State's interest in preventing "raiding" than is the New York rule. Voters who have recently demonstrated loyalty to another party by voting in its primary, are more likely than those who have not to engage in "raiding." Moreover, challenges for violations of the 23-month rule are not likely to be made where no serious danger of "raiding" is perceived.

Both the Illinois rule struck down today and the New York rule upheld in *Rosario* restrict voters' freedom to associate with the political party of their choice. In both instances the State has sought to justify the restrictions as promoting the State's legitimate interest in preventing "raiding." While neither rule is perfectly fashioned to accomplish that and no other result, I cannot conclude that the Illinois rule imposes a significantly greater burden on the exercise of associational freedom than does the New York rule we upheld last Term in *Rosario*.