RILEY, Chief Judge,
concurring in part and dissenting in part.
Because I believe Minnesota’s independent expenditure law impermissibly burdens political speech, I respectfully dissent from Part II.B. of the majority opinion.

Part II.B.

Under Minnesota’s relatively complex web of regulations, corporations[10] wishing to make an independent expenditure must comply with burdensome record-keeping and reporting requirements associated with creating and maintaining a political fund. See ante at 308-09 (describing rele *320 vant portions of the challenged law). Corporations and responsible individuals failing to comply with Minnesota’s regulatory scheme are subject to substantial civil and criminal penalties, ranging from fines to imprisonment of up to five years. See Minn.Stat. §§ 10A.12, subdivs. lb and 6; 10A.121, subdiv. 2; 10A.13, subdiv. 1; 10A.14, subdiv. 4; 10A.15, subdiv. 4; 10A.16; 10A.17, subdiv. 5; 10A.20, subdiv. 12; 211B.15, subdivs. 6-7. The provisions manifestly discourage corporations, particularly corporations with limited resources, from engaging in protected political speech, and hinder their participation in the political debate and their access to the citizenry and the government. See Citizens United v. Fed. Election Comm’n, — U.S. -, 130 S.Ct. 876, 907-08, 175 L.Ed.2d 753 (2010).
Perhaps most onerous is the ongoing reporting requirement. Once initiated, the requirement is potentially perpetual[11] regardless of whether the corporation ever again makes an independent expenditure. See § 10A.20, subdivs. 2 and 7 (requiring political funds to file five reports during a general election year and one report during a non-general election year, even if the political fund has been inactive during that period). The majority draws comfort from the fact Minnesota allows corporations to mitigate this burden by “easily creating] and dissolving] a political fund.” Ante at 313. The trouble with this solution is the corporation’s constitutional right to speak through independent expenditures dissolves with the political fund. To speak again, the corporation must initiate the bureaucratic process again.
In Citizens United, the Supreme Court instructed, “the Government may not suppress political speech on the basis of the speaker’s corporate identity. No sufficient governmental interest justifies limits on the political speech of ... corporations.” Citizens United, 130 S.Ct. at 913. Because political “[s]peech is an essential mechanism of democracy,” “the means to hold officials accountable to the people,” “a precondition to enlightened self-government and a necessary means to protect it,” “political speech must prevail against laws that would suppress it, whether by design or inadvertence.” Id. at 898. Therefore, “[l]aws that burden political speech are ‘subject to strict scrutiny,’ which requires the Government to prove that the restriction ‘furthers a compelling interest and is narrowly tailored to achieve that interest.’ ” Id. (quoting Fed. Election Comm’n v. Wis. Right to Life, Inc., 551 U.S. 449, 464, 127 S.Ct. 2652, 168 L.Ed.2d 329 (2007) (plurality opinion of Roberts, C.J.)).
Independent expenditures are indisputably political speech. See Buckley v. Valeo, 424 U.S. 1, 39, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (explaining independent expenditures constitute expression “at the core of our electoral process and of the First Amendment freedoms.”) (quoting Williams v. Rhodes, 393 U.S. 23, 32, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968) (internal quotation marks omitted)); Iowa Right to Life Comm., Inc. v. Williams, 187 F.3d 963, 967 (8th Cir.1999) (recogniz *321 ing communication “through independent expenditures, as ‘core’ First Amendment activity”). Under Minnesota’s scheme, a corporation is compelled to decide whether exercising its constitutional right is worth the time and expense of entering a long-term or even perpetual morass of regulatory red tape. Some corporations will decide the exercise is simply not worth the trouble. Because the burdens associated with Minnesota’s independent expenditure law chill corporate political speech, I would subject the challenged provisions to strict scrutiny analysis. It is unlikely Minnesota would be able to prove aspects of the law, particularly the ongoing reporting requirements, are the least restrictive means of accomplishing a compelling interest.
Despite recognizing the challenged law burdens corporate political speech, see ante at 314, the majority forgoes strict scrutiny analysis, opting instead for “exacting scrutiny” because the majority classifies the provisions as disclosure laws “designed to require corporations to disclose certain information when making independent expenditures,” ante at 316. According to the majority, Minnesota’s laws “are similar in purpose and effect to the disclosure laws that the Supreme Court upheld in Citizens United.” Ante at 311. I disagree with this classification because certain requirements Minnesota imposes on corporations have nothing or very little to do with disclosure.
The federal law challenged in Citizens United, 130 S.Ct. at 913-16 (analyzing 2 U.S.C. §§ 441d(d)(2), 434(f)(1)), required filing a disclosure report only when a corporation (or anyone else) spent more than $10,000 on electioneering communications (e.g., a television commercial) during any calendar year. See § 434(f). Then, when a communication disclosed “_is responsible for the content of this advertising,” as required by § 441d(d)(2), a citizen could identify the responsible party in public records and discover relevant information. See Citizens United, 130 S.Ct. at 916. This event-driven reporting requirement ended as soon as the report was filed. See § 434(f). The effect of the law — requiring one-time disclosure only when a substantial amount of money was spent — logically matched the government’s disclosure purpose. In contrast, the effect of Minnesota’s ongoing reporting requirement, which is initiated upon a $100 aggregate expenditure, and is untethered from continued speech, does not match any disclosure interest. Other requirements, such as requiring a treasurer, segregated funds, and record-keeping, also are only tangentially related to disclosure.
The majority explains that “[i]n Buckley v. Valeo the Supreme Court approved a periodic reporting requirement for entities other than PACs or candidates, necessarily holding that such requirements are not per se invalid. 424 U.S. 1, 80-81, 160, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976).” Ante at 314, n. 4 (discussing Buckley’s analysis of 2 U.S.C. § 434(e) (1970 ed., Supp. IV)), Pub.L. No. 92-225 § 305, 86 Stat. 3 (current version at 2 U.S.C. § 434(c)). But the Court in Buckley was not addressing the periodic nature of the requirements. Instead, the Court was construing the meaning of the word “expenditure” in the statute to ensure it “precisely further[ed]” the government’s goal “to promote full disclosure of campaign-oriented spending,” Id. at 78, 96 S.Ct. 612, and did not violate constitutional due process rights because of vagueness concerns, see Id. at 76, 96 S.Ct. 612. Regardless, the law at issue in Buckley only required periodic reporting, which at most would require filing statements through the end of the calendar year in which a qualifying independent expenditure was made. See § 434(e). The concern here is not that Minnesota’s *322 reporting requirement is periodic; the concern is the reporting requirement is ongoing unless the political fund is terminated or forced to dissolve. Periodic reporting requirements are not per se invalid; but are subject to strict scrutiny, at least when the duration of those requirements is ongoing and indefinite.
A state should not be able to sidestep strict scrutiny analysis simply by labeling burdensome regulations as a “disclosure law,” when the effect, if not the design, is to discourage corporate speech. See generally Fed. Election Comm’n v. Mass. Citizens for Life, Inc., 479 U.S. 238, 262, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986) (engaging in strict scrutiny when reviewing a federal campaign law even though the government claimed the law implicated a disclosure interest); Nat'l Right to Life Political Action Comm. v. Connor, 323 F.3d 684, 694-95 & n. 11 (8th Cir.2003) (discussing strict scrutiny for a law implicating the state’s disclosure interest because “state election laws that severely restrict the right of association by attempting to regulate the internal affairs of political organizations must be narrowly drawn to serve a compelling state interest”). Allowing such a characterization of our review process risks transforming First Amendment jurisprudence into a legislative labeling exercise.
Assuming arguendo exacting scrutiny is appropriate, the law still fails because Minnesota is unable to show a substantial relation between its ongoing reporting requirement and any important governmental interest. Though less rigorous than strict scrutiny, exacting scrutiny is more than a rubber stamp. See Buckley, 424 U.S. at 64, 66, 96 S.Ct. 612 (describing exacting scrutiny as a “strict test” requiring more than “a mere showing of some legitimate governmental interest”); Elrod v. Burns, 427 U.S. 347, 362-63, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (noting the “[sjtate may not choose means that unnecessarily restrict constitutionally protected liberty” nor choose a regulatory scheme broadly stifling speech if the state has available a “less drastic way of satisfying its legitimate interests”) (quoting Kusper v. Pontikes, 414 U.S. 51, 59, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973) (internal quotation marks omitted)). Provisions “no more than tenuously related to the substantial interests disclosure serves ... fail exacting scrutiny.” Buckley v. Am. Constitutional Law Found. (ACLF), 525 U.S. 182, 204, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999) (internal marks omitted).
Each of Minnesota’s provisions should first be reviewed separately to determine whether each regulation is substantially related and necessary to accomplish the identified disclosure interests, see ACLF, 525 U.S. at 201-203, 119 S.Ct. 636 (concluding certain aspects of Colorado’s law governing disclosure requirements for ballot-initiative proponents failed exacting scrutiny because the state’s important interests were adequately met through other valid aspects of the law), and it is Minnesota’s burden to establish the required, relationship, see Elrod, 427 U.S. at 362, 96 S.Ct. 2673 (“The interest advanced must be paramount, one of vital importance, and the burden is on the government to show the existence of such an interest.”). For the reasons discussed above, it is doubtful Minnesota can justify the ongoing reporting requirement.
Under either strict or exacting scrutiny, I would hold Minnesota Citizens is likely to prevail on the merits of its challenge to Minnesota’s corporate independent expenditure law, and I would reverse the district court’s denial of the preliminary injunction. See Phelps-Roper v. Nixon, 545 F.3d 685, 690 (8th Cir.2008) (reasoning that likely success on the merits in a First Amend *323 ment challenge often establishes irreparable harm, a balance of equities in favor of freedom of expression, and public interest). I respectfully dissent from Part II.B. of the majority’s opinion.

Part II.C.

I concur with the majority’s judgment in Part II. C., affirming the district court’s refusal to enjoin Minnesota’s ban on direct corporate contributions to candidates and affiliated entities. See § 211B.15, subdiv. 2. In Citizens United, the Supreme Court did not explicitly overrule Fed. Election Comm’n v. Beaumont, 589 U.S. 146, 123 S.Ct. 2200, 156 L.Ed.2d 179 (2003), or the Court’s equal protection holding in Austin v. Mich. Chamber of Commerce, 494 U.S. 652, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990), overruled in part by Citizens United, 130 S.Ct. at 913. Because the Supreme Court has instructed courts to wait for it to overrule its own decisions, see Agostini v. Felton, 521 U.S. 203, 237-38, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997), the district court did not abuse its discretion in determining Minnesota Citizens is unlikely to win on the merits of this claim.
I write separately to make two observations. First, Citizens United’s outright rejection of the government’s anti-distortion rationale, see id. at 130 S.Ct. at 904, as well as the Court’s admonition that “the State cannot exact as the price of [state-conferred corporate] advantages the forfeiture of First Amendment rights,” Id. at 905 (quoting Austin, 494 U.S. at 680, 110 S.Ct. 1391 (Scalia, J., dissenting) (internal quotation marks omitted)), casts severe doubt on Beaumont and Austin, leaving the cases’ respective precedential value on shaky ground. See Beaumont, 539 U.S. at 164-65, 123 S.Ct. 2200 (Thomas, J., dissenting) (articulating the belief that all campaign finance laws are subject to strict scrutiny and that the Colorado contribution ban was “not narrowly tailored to meet any relevant compelling state interest”); id. at 164, 123 S.Ct. 2200 (Kennedy, J., concurring) (“Were we presented with a case in which the distinction between contributions and expenditures under the whole scheme of campaign finance regulation were under review, I might join Justice Thomas’ dissenting opinion.”); Austin, 494 U.S. at 665-66, 110 S.Ct. 1391 (incorporating much of the Court’s now-overruled First Amendment analysis into its equal protection analysis); see also Dallman v. Ritter, 225 P.3d 610, 634-35 (Colo. 2010) (holding a state law allowing corporations to contribute to candidates, but forbidding labor unions from doing the same violated the Equal Protection Clause of the Fourteenth Amendment).
Second, the fact the district court’s conclusion does not rise to an abuse of discretion does not mean Beaumont and Austin compel an ultimate holding in favor of Minnesota on this issue. Minnesota Citizens may develop a factual record demonstrating Minnesota’s ban on corporate expenditures is not “closely drawn” to a “sufficiently important interest.” See Beaumont, 539 U.S. at 162, 123 S.Ct. 2200 (quotation omitted). The district court should also be mindful that even under Austin, strict scrutiny is appropriate when reviewing the merits of Minnesota Citizens’ equal protection challenge, and it is Minnesota’s burden to prove the differences between corporations and unions articulated in Austin apply under the facts of this case. See Austin, 494 U.S. at 666, 110 S.Ct. 1391.

Conclusion

I would reverse the district court’s denial of a preliminary injunction, because I believe Minnesota Citizens is likely to prevail on the merits of its claim that Minnesota’s corporate independent expenditure *324 law violates Minnesota Citizens’ First Amendment rights.

. The restrictions at issue are much broader than just regulating corporations and indeed affect nearly all associations. Not only does Minnesota's Fair Campaign Practices Act expressly treat limited liability companies the same as corporations, see Minn.Stat. § 211B.15, the requirement that only permits political funds (or political committees) to make independent expenditures is even broader, reaching almost every "association.” See § 10A.12, subdiv. la. Even the smallest partnership is regulated. See § 10A.01, sub-div. 6 (" 'Association' means a group of two or more persons, who are not all members of an immediate family, acting in concert.”)

. Minnesota's Campaign Finance and Public Disclosure Board (Board) may, with notice, force dissolution of an "inactive” political fund if "two years have elapsed since the end of a reporting period during which the political ... fund made an expenditure or disbursement requiring disclosure under [the Campaign Finance and Public Disclosure Act].” § 10A.242, subdivs. 1-2. Until the Board provides such notice, a corporation presumably must continue to file reports on its inactive political fund. The statute is unclear as to what mechanism triggers the process of dissolving inactive political funds. Regardless, a corporation wishing to retain its First Amendment right to make independent expenditures must continue reporting on an ongoing basis.